# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# PINE BLUFF DIVISION

RODNEY L. JONES
ADC# 148884                                                              PETITIONER

VS.                          CASE NO. 5:15-CV-357-BRW-BD

WENDY KELLEY, Director,
Arkansas Department of Correction                                        RESPONDENT

## RECOMMENDED DISPOSITION

I.  **Procedure for Filing Objections**:

This Recommended Disposition ("Recommendation") has been sent to Judge Billy Roy Wilson. Any party to this suit may file written objections with the Clerk of Court within fourteen (14) days of filing of the Recommendation. Objections must be specific and must include the factual or legal basis for the objection. An objection to a factual finding must identify the finding of fact believed to be wrong and describe the evidence that supports that belief.

By not objecting, any right to appeal questions of fact may be jeopardized. And, if no objections are filed, Judge Wilson can adopt this Recommendation without independently reviewing the record.

II. **Background**:

Mr. Jones's petition is currently before this Court after the Eighth Circuit granted a certificate of appealability and remanded the case for further proceedings on the question of whether trial counsel rendered ineffective assistance by failing to present, and request an instruction on, an involuntary-intoxication defense under Arkansas Code Annotated

§ 5-2-207.[1] (Docket entry #28) (citing *U.S. v. MacDonald*, 73 M.J. 426, 437-39 (C.A.A.F. 2014)).

## III. Discussion:

### A. Procedural Default

Before seeking federal habeas review, a state prisoner must first fairly present the substance of each claim to every appropriate state court, thereby alerting those courts to the federal nature of his claims and giving those courts an opportunity to pass upon and correct any constitutional errors. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); 28 U.S.C. § 2254(b) and (c). And the petitioner's federal habeas claims must rely on the same factual and legal bases raised in the state courts. *Interiano v. Dormire*, 471 F.3d 854, 856 (8th Cir. 2006) (citations omitted). Claims raised in a federal habeas petition that were not exhausted through state court proceedings are deemed defaulted, even if there is no remaining state court remedy.

Mr. Jones never raised the issue presented in this petition with the state courts. On direct appeal, he argued that the trial court erred when it denied his motions for mistrial and failed to instruct the jury on the lesser-included offenses of reckless manslaughter and negligent homicide. *Jones v. State*, 2012 Ark. 38, at 3, 388 S.W.3d 411, 413. The Arkansas Supreme Court considered all of Mr. Jones's claims but rejected the arguments and affirmed the judgment. *Id.* at 8-9, 388 S.W.3d at 416.

---

[1] The Court denied Mr. Jones's application for a certificate of appealability with respect to all other issues presented in the application. (#28)

Mr. Jones raised ineffective assistance of counsel claims with the trial court in his post-trial (Rule 37) petition. He claimed that his counsel was ineffective for: (1) failing to fully investigate or prepare a defense that, during the time of the murder, he was suffering from psychosis induced by prescription drugs Cymbalta and Chantix; (2) failing to advise him of a plea offer; and (3) failing to argue the statements he made to police were involuntary because he was suffering from a mental defect, delusions, and psychosis at the time. (#6-6 at 7-11) The trial court held a hearing on the petition, at which Mr. Jones and his trial counsel testified. (*Id*. at 205-236) In a written order, the trial court, applying the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), denied the petition. (*Id*. at 173-74)

Mr. Jones appealed the circuit court's decision denying his Rule 37 petition to the Arkansas Supreme Court. On appeal, Mr. Jones argued: (1) trial counsel was ineffective for failing to completely investigate his "involuntary drug-induced psychosis" by looking beyond the warning labels and investigating other similar cases; (2) he was denied assistance of counsel during his Rule 37 proceedings; (3) the trial court and Arkansas Supreme Court denied him use of a trial transcript during the Rule 37 process; and (4) counsel was ineffective during plea negotiations. (#6-7 at 6, 31-55) The Arkansas Supreme Court, applying the standard set forth in *Strickland,* affirmed the trial court's order denying Mr. Jones relief on his Rule 37 petition. *Jones v. State*, 2014 Ark. 448, at 11, 486 S.W.3d 743, 750.

Mr. Jones never claimed in the state court proceedings that his counsel was ineffective for failing to present a defense of involuntary intoxication or for failing to

3

request a jury instruction on involuntary intoxication. Accordingly, the claims are defaulted unless an exception applies.

   B.   **Ineffective Assistance of Counsel**

The doctrine barring procedurally defaulted claims is not without exception. Under *Martinez v. Ryan*, the Court may address a "substantial claim" of ineffective assistance of counsel at trial if, in the initial collateral review proceeding, Mr. Jones did not have counsel. *Martinez*, 566 U.S. 1, 16 (2012). *Martinez* is applicable to Mr. Jones's case because he did not have counsel in the initial review proceeding.

To prevail on his ineffective assistance of counsel claim, Mr. Jones must show: (1) that his trial counsel's performance was so deficient that it fell below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney; and (2) that there is a reasonable probability that the outcome would have been different but for the substandard performance of trial counsel. *Strickland*, 466 U.S. at 687-94. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Wiggins v. Smith*, 539 U.S. 510, 534 (quoting *Strickland*, 466 U.S. at 694). The Court's scrutiny of counsel's performance is highly deferential, and the Court applies a strong presumption that counsel's conduct fell within the "wide range of reasonable professional judgment." *Bucklew v. Luebbers*, 436 F.3d 1010, 1016 (8th Cir. 2006) (citing *Strickland*, 466 U.S. at 689); see also *Middleton v. Roper*, 455 F.3d 838, 845 (8th Cir. 2006).

### 1. Performance

In determining whether counsel's performance was deficient, we must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. "Matters of trial tactics and strategy are not grounds for post-conviction relief on the basis of ineffective assistance of counsel." *Feuget v. State*, 2015 Ark. 43, at 7, 454 S.W.3d 734, 740 (citing *Rankin v. State,* 365 Ark. 255, 258, 227 S.W.3d 924, 927 (2006)). A petitioner claiming ineffective assistance must overcome a presumption that counsel's conduct fell within the wide range of reasonable professional assistance. He must identify counsel's acts and omissions that, viewed from counsel's perspective at the time of trial, could not have been the result of reasonable professional judgment. *Id*. at 11, 454 S.W.3d at 712 (Danielson, J., concurring) (citing *Strickland*, 466 U.S. 668) (other citation omitted).

The performance of Mr. Jones's counsel did not fall below the skill and diligence of a reasonably competent attorney for a number of reasons. At the time of Mr. Jones's trial, information regarding the side-effects of Chantix were still emerging. The Court finds no case, as of the time of Mr. Jones's trial, where any defendant in Arkansas successfully defended a case on the basis of involuntary intoxication due to the use of Chantix or similar prescription drugs. Given the novelty of the defense as applied to the use of Chantix, it was objectively reasonable for Mr. Jones's counsel to strategically choose a different defense. *See*, *e.g.*, *Ruff v. Armontrout*, 77 F.3d 265, 268 (8th Cir. 1996) ("Counsel need not raise every single conceivable argument to defeat a claim of ineffective assistance of counsel.").

Mr. Jones cites *U.S. v. MacDonald*, 73 M.J. 426, 437-39 (C.A.A.F. 2014) in support of his claim that his counsel was ineffective for failing to request an involuntary-intoxication instruction. *MacDonald* concerned a military court's failure to *sua sponte* give an involuntary-intoxication instruction, as required by military law. The United States Army Court of Criminal Appeals found that the error was harmless, reasoning that the military judge's instruction on mental responsibility had adequately covered the involuntary-intoxication defense. On *de novo* review, however, the United States Court of Appeals for the Armed Forces (C.A.A.F.) reversed and ordered a new hearing, finding that the error was not harmless.[2] *Id*. at 428. Because *MacDonald* was not decided until August 27, 2014—well after Mr. Jones's October, 2010 trial—the case was not available to Mr. Jones's counsel to argue in support of an involuntary-intoxication defense.

Even if the *MacDonald* case had been available, given the facts and the applicable law in this case, it was not unreasonable professional judgment for Mr. Jones's counsel to decide not to defend the case based on involuntary intoxication.

Arkansas's involuntary intoxication statute provides:

(a) Intoxication that is not self-induced intoxication is an affirmative defense to a prosecution if at the time a person engages in the conduct charged to constitute the offense the person lacks capacity to:

    (1) Conform his or her conduct to the requirements of the law; or

    (2) Appreciate the criminality of his or her conduct.

---

[2] On rehearing, Mr. MacDonald disavowed any defense of involuntary intoxication or lack of mental responsibility stemming from his use of Chantix. Mr. MacDonald pleaded guilty and was convicted of resisting arrest, unpremeditated murder, assault consummated by battery, and aggravated assault. *U.S. v. MacDonald*, No. ARMY 20091118, 2017 WL 416776, at *1 (A. Ct. Crim. App. Jan. 27, 2017).

(b) As used in this section:

(1) "Intoxication" means a disturbance of a mental or physical capacity resulting from the introduction of alcohol, a drug, or another substance into the body; and

(2) "Self-induced intoxication" means intoxication caused by a substance that the actor knowingly introduces into his or her body and the actor knows or ought to know the tendency of the substance to cause intoxication.

ARK. CODE ANN. § 5-2-207.

In order to succeed on a defense of involuntary intoxication, Mr. Jones would have had to establish that his use of Chantix at the time he murdered his ex-wife caused a disturbance of mental capacity that prevented him from conforming his conduct to the requirements of the law or from appreciating the criminality of his conduct.

Here, Bill James, Mr. Jones's trial counsel, testified at the Rule 37 hearing that there was a question as to whether Mr. Jones was actually taking Chantix at the time of the murder.[3] Mr. James stated:

> You know, candidly, the defense – although I was unaware of – prior to this trial of the black-label drugs out there that had these homicidal and suicidal ideations attached to them. He was actually taking two of them, *if he was taking them.* There was the Chantix. He had a prescription for it. There – you know, *a little cross examination on the part of Mr. Vaden with regard to those drugs or – to Dr. Gale might have been fruitful in the State's trying to determine whether he was actually taking them or not.* There was – I mean,

---

[3] At the hearing, Mr. James and the court mistakenly believed that the attorney-client privilege still applied. (#6-6 at 223) *State v. Cantrell*, 2011 Ark. 449, at 5 ("By filing the petition, [the petitioner] puts in controversy the professional conduct of counsel, and as a condition of pursuing that petition, he must waive all attorney-client privilege with respect to the issues raised in the petition.") (citing *Jacobs v. State,* 253 Ark. 35, 484 S.W.2d 343 (1972)). Consequently, Mr. James never testified to anything Mr. Jones told him about his use of Chantix at the time of the murder.

7

> he'd had the prescription for a long time and, you know *there was an argument that he – there could have been an argument that he wasn't even taking it at the time*.
>
> But he had a prescription. It was never questioned by Mr. Vaden or any – any of the doctors, you know. I could not get Dr. Moneypenny to even go along with the defense. Dr. Gale, he – he believed in it as a possibility and – I mean, certainly it was there. . . .

(#6-6 at 223) (emphasis added)

Medical records that were admitted into evidence at trial corroborate Mr. James's testimony. They indicate that Mr. Jones did not have a current prescription for Chantix at the time of the murder on September 5, 2008. Leto Quarles, M.D., treated Mr. Jones from August, 2007 until June, 2008. (#7, V. 10 at 1993-2008) Dr. Quarles first prescribed Chantix for Mr. Jones on August 21, 2007. (*Id*. at 1994) The "stop date" on the prescription was November 21, 2007. (*Id*.) In September of 2007, Mr. Jones reported to Dr. Quarles that Chantix had helped him to decrease from smoking four packs of cigarettes per day to five or ten cigarettes per day, and he planned to quit smoking entirely later in the week. (*Id*. at 1997) In October of 2007, Mr. Jones reported that he was doing well on Chantix and had not smoked cigarettes for almost six weeks. (*Id*. at 2001) He requested a refill for Chantix, and Dr. Quarles obliged. (*Id*.)

During a visit to Dr. Quarles on December 18, 2007, however, Mr. Jones reported that he had resumed smoking and wanted to wait for warmer weather to try again to quit. (*Id*. at 2003) Chantix remained on Mr. Jones's medication list, but with a stop date of January 16, 2008. (*Id*. at 2004) During a follow-up visit to Dr. Quarles on January 22, 2008, Mr. Jones again reported smoking and stated that he was not ready to quit. (*Id*. at 2005) Dr. Quarles removed Chantix from Mr. Jones's medication list. (*Id*. at 2006)

In records from Mr. Jones's last visit to Dr. Quarles on June 4, 2008, Mr. Jones reported that he was smoking three packs of cigarettes per day and was not ready to quit. (*Id*. at 2008) Dr. Quarles noted that Mr. Jones would let him know when he was ready to plan his next attempt to stop smoking. (*Id*.) As a result, Dr. Quarles did not renew Mr. Jones's prescription for Chantix, and it was not on his medication list. (*Id*.)

Mr. Jones was last prescribed Chantix in October of 2007, more than ten months before the murder occurred. The records, therefore, corroborate Mr. James's testimony that cross-examination would likely have revealed that Mr. Jones was not even taking Chantix at the time of the murder. Moreover, in the pending case, Mr. Jones has not offered any evidence indicating that he was actually taking Chantix at the time of the murder.

Even if Mr. Jones could establish that he was taking Chantix at the time of the murder, he would also have to present evidence that he was one of the "rare" individuals in whom the drug induced homicidal activity. *E.g.*, *Prendergast v. Secretary, DOC and Florida Attorney* General, 2015 WL 7450107 (M.D. Fla. 2015). Further, a "Chantix rage" defense in this case would have been undermined considerably by Mr. Jones's girlfriend, who testified that, *months before the murder*, Mr. Jones had asked her to provide him with an alibi when he killed his ex-wife. And the fact that Mr. Jones travelled fifteen hours from Colorado to Arkansas to commit the murder would likely have given reasonable jurors cause to question whether the murder was prompted by a Chantix-induced rage. *Jones*, 2012 Ark. 38, at 1-2, 338 S.W.3d at 412. Moreover, the credibility of an involuntary-intoxication defense would have been further eroded by evidence that

Mr. Jones attempted to mislead investigators by initially claiming that he was in Colorado at the time of the murder. This evidence, which the jury heard in the trial, would have hobbled any claim by Mr. Jones that he was unable to understand the consequences of his actions.

The problems with advancing an involuntary-intoxication defense were further compounded by the fact that Mr. James did not have an expert who would testify that Chantix caused Mr. Jones to be "intoxicated," as defined in the statute. At the Rule 37 hearing, Mr. James testified:

> With regard to the – but with regard to the Chantix and stuff, I don't know that there was a whole much more I could have done. I mean – and – and you never can say you did every possible thing that could have been done, but I don't know there was – I didn't have, I didn't believe, the ability to do much more than that. Like I said, we couldn't even get our psychologist to go along with the defense. . . . But as far as the Chantix stuff, I don't – I don't know that there's anything else we could have got out of it, honestly.

(#6-6 at 224-25)

Mr. Jones's expert, Bob Gale, M.D., explained at trial that Chantix could cause aggressive behavior and homicidal ideation, evidenced by increased anger or rage toward another person. (*Id.*, V. 7 at 1378-79) Dr. Gale opined that the combination of, "four really potent medicines, given the underlying condition of the fibromyalgia, the depression with the chronic pain, and given the acute stressors . . . produced this brief psychotic disorder." (*Id.* at 1381) Under cross-examination, however, Dr. Gale admitted that reports to the FDA of Chantix causing homicidal ideation were "relatively rare." When asked whether Chantix caused Mr. Jones to murder his ex-wife, he stopped short of testifying that Chantix was the cause and instead responded: "I think it's a major

10

contributor." (*Id*. at 1507) Later in cross-examination, Dr. Gale stated: "[B]ut you've omitted a couple of reasons why I can't specifically say that Chantix did it." (*Id*. at 1509) Dr. Gale consistently testified that it was a combination of different medications, stressors, and chronic pain that caused Mr. Jones's "brief psychotic disorder," not one medication. (*Id*.)

In light of the facts presented, the Court cannot conclude that Mr. Jones's trial counsel's performance fell below the standard of the customary skill and diligence displayed by a reasonably competent attorney in choosing not to pursue an involuntary-intoxication defense.

## 2. Prejudice

The second part of the *Strickland* test requires the Court to determine whether counsel's failure to present or request an instruction on an involuntary-intoxication defense prejudiced Mr. Jones. In order to find prejudice under *Strickland*, the court must find that it is "reasonably likely" that the result would have been different absent the error. *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (quoting *Strickland*, 466 U.S. at 696). "The *Strickland* prejudice standard is less demanding than a more-probable-than-not standard, but the difference is 'slight and matters only in the rarest case.'" *Id*. (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)). "To satisfy *Strickland*, the likelihood of a different result must be 'substantial, not just conceivable.'" *Id*.

Here, there is no reason to believe that the trial court would have given an involuntary-intoxication instruction, even if Mr. James had requested one. Furthermore,

11

there is not a "substantial likelihood" that the outcome of the trial would have been different if an involuntary-intoxication defense been presented.

At the time of the trial, other defendants in Arkansas had attempted, without success, to defend on the affirmative defense of involuntary intoxication based on their actual use of a prescription medication other than Chantix. In January, 2010, Michael Feuget defended a bank robbery charge on a theory of involuntary intoxication. *Feuget*, 2015 Ark. 43, 454 S.W.3d 734. Dr. Gale testified at Mr. Feuget's trial that Zoloft and Deplin caused Mr. Feuget to enter a toxic state that rendered him unable to conform his conduct to the requirements of the law. *Id*. at 1-2, 454 S.W.3d at 737-38. Mr. Feuget's treating physician, however, testified that he did not recall writing him a prescription for Deplin a week before the robbery, although he acknowledged it was possible. *Id*. at 2, 454 S.W.3d at 737. The jury rejected the defense and convicted Mr. Feuget of theft of property and two counts of aggravated robbery. *Id*. at 3, 454 S.W.3d at 738.

Appealing the trial court's denial of his petition under Ark. R. Crim. P. 37, Mr. Feuget argued that his counsel was ineffective for both failing to call a records custodian and failing to subpoena pharmacy records showing that he was given a prescription for Deplin the week before the robbery so as to bolster his involuntary-intoxication defense. *Id*. at 6, 454 S.W.3d at 739. The Arkansas Supreme Court, applying *Strickland*, concluded that Mr. Feuget's counsel did not fall below the standard of a reasonable attorney and that Mr. Feuget was not prejudiced by his counsel's choice not to present other evidence because one of the State's physicians, who had examined Mr. Feuget,

testified that, in spite of the medication, Mr. Feuget appreciated the criminality of his actions and was capable of conforming his conduct to the law. *Id*.

Unlike in *Feuget*, it is not at all clear in this case that counsel would have been successful in convincing the trial court to instruct the jury on involuntary intoxication. First, there was no evidence that Mr. Jones was actually taking Chantix at the time of the murder. Second, there was no expert testimony that Mr. Jones was involuntarily intoxicated by Chantix on the day of the murder. Instead, there was testimony from both Dr. Gale who "can't specifically say that Chantix did it" and from William A. Cochran, Ph.D., who examined Mr. Jones and testified that he suffered from depression but retained the capacity to form the culpable mental state necessary to commit the offense charged and to engage in purposeful behavior. (#7, V.6 at 1268-69); *Jones*, 2014 Ark. 448, at 5, 486 S.W.3d at 747.

Moreover, there was substantial evidence presented at trial indicating that Mr. Jones planned the crime and did not act in a Chantix rage. Evidence showed that Mr. Jones drove fifteen hours from Colorado to Arkansas, arriving in the late afternoon. *Jones*, 2012 Ark. 38, at 1-2, 338 S.W.3d at 412-13. After resting, he drove to his ex-wife's residence, parked a short distance from her house, and took a position approximately 30 feet from the front window of the house. *Id*. Mr. Jones was armed with a Marlin lever-action 30-30 with a scope that he brought with him from Colorado. *Id*. He fired one shot through the window of the residence, fatally striking the victim in the back.

As noted, the State's evidence of premeditation was bolstered by the testimony of Mr. Jones's girlfriend. She testified that "months before" the murder, Mr. Jones had

13

approached her about providing him an alibi, as he intended to "off" his ex-wife. (#7, V.6 at 1140-41)

There was also evidence indicating that Mr. Jones understood the consequences of his actions. When investigators first interviewed Mr. Jones, he attempted to deceive them by falsely stating that he was in Colorado at the time of the murder. Later, when confronted with the inconsistencies in his story, Mr. Jones confessed to the murder and gave investigators a detailed account of how he had carried out the crime, as well as the location, in Kansas, where he had disposed of the murder weapon. *Id*. at 2, 338 S.W.3d at 412-13.

Given the testimony and evidence produced at trial indicating Mr. Jones's understanding of the events as well as his attempts to cover-up his crime, it is far from "reasonably likely" that the trial court would have given an involuntary-intoxication instruction.[4]

---

[4] In her supplemental brief, Ms. Kelley argues that Mr. Jones was taking methamphetamine at the time of the murder. Ms. Kelley bases this argument on her contention that Mr. Jones's mother testified that Mr. Jones "took a lot of meth." (#42 at 15, 21, 27-28) This reading of Ms. Jones's testimony assumes facts not in evidence. Mr. James asked Ms. Jones a question relating to a video recording of a conversation she had with Mr. Jones at the police station. He asked, "You asked him how he did it, and he said he took a lot of meth. Why would you ask him how – how he did that?" (#7, V.6 at 1197) In her response, Ms. Jones never confirmed that Mr. Jones took methamphetamine. (*Id*. at 1197) Instead, she answered the latter part of the question: "Because it's such a long drive down here, I didn't think he could drive down here by himself like that and drive back." (*Id*.) The Court has reviewed the video recording of Mr. Jones's conversation with his mother and has discovered that counsel's question misstated Mr. Jones's response to his mother's question. (#7, State's Exhibit No. 13) After reviewing the video recording, the Court finds that Mr. Jones told his mother that he was able to do it because he took a lot of "pain meds." (*Id*.) Accordingly, the Court will not address Ms. Kelley's argument that Mr. Jones was taking methamphetamine at the time of the murder.

Finally, the jury's responses to interrogatories on the verdict form during the sentencing phase of the trial further indicate that it is not reasonably likely that the outcome of the trial would have been different had counsel defended the case based on involuntary intoxication. The jury found that Mr. Jones suffered from a depressive disorder. (#7, V.2 at 415) At least one, but not all, of the members of the jury found that Mr. Jones was taking Chantix and that it affected his impulse control. (*Id*. at 417) None of the members of the jury found, however, that the medications Mr. Jones was taking caused him to commit the crime. Additionally, none of the members of the jury found that Mr. Jones suffered a brief psychotic episode prior to travelling to Arkansas to kill his ex-wife. (*Id*. at 421) In other words, the jury rejected the argument that Mr. Jones's ingestion of medication caused him to commit the crime. Mr. Jones was not prejudiced by his counsel's performance.

IV.     **Certificate of Appealability:**

When entering a final order adverse to a petitioner, the Court must issue or deny a certificate of appealability. Rule 11 of the Rules Governing Section 2254 Cases in the United States District Court. The Court can issue a certificate of appealability only if Mr. Jones has made a substantial showing that he was denied a constitutional right. 28 U.S.C. § 2253(c)(1)-(2). In this case, Mr. Jones has not provided a basis for the Court to issue a certificate of appealability. Accordingly, a certificate of appealability should be denied.

## V.     Conclusion:

Mr. Jones has not established a substantial claim of ineffective assistance for counsel's failure to present, and request an instruction on, an involuntary intoxication defense, and the claim should be denied as procedurally defaulted.

DATED this 22nd day of September, 2017.

_____
UNITED STATES MAGISTRATE JUDGE